Good morning. May it please the court. I'm Carol Brewer, representing the plaintiff, Roderick Wright, and the putative class. At council table is my co-counsel, Michael Lindsey. We have two issues before the court this morning. First is the plaintiff's UCL standing to bring his action. Second, the district court's error of substantive law in denying class certification. I'd like to leave five minutes for rebuttal. First, the UCL standing. Plaintiff brought his UCL claim to enforce substantive law, California's Re-Slavery and Automobile Sales Finance Act, particularly the anti-deficiency provision of that act. He has standing under both the unlawful and the deceptive prongs of the UCL. The unlawful prong applies because the defendant, Ally, sent a demand letter to him that was unlawful, and he responded with a payment. Plaintiff was not a stranger to Ally. He had years of dealing with her. Let's get the chronology down. So the letter that Ally sends is when? The letter that Ally sent him was dated October 9, 2009. Okay. And that letter was what? I want you to tell me what that letter was. That was a deficiency demand letter. It said, as of the date of this letter, the amount you still owe us under the terms of your contract is $9,694. In response to that, nine days after the letter and probably only a couple of days after he received it, he sent a payment. He didn't retain his attorney, Mr. Lindsey, until four days after he sent the payment. And what's the error in the letter? The error in the letter is that he owed the deficiency. The misrepresentation was that he owed the deficiency. Under Reese Levering's anti-deficiency provisions, that's Civil Code 2983.2a, a deficiency is owed by a defaulting consumer only if the post-repossession notice complies with the Reese Levering statute. Here, the undisputed facts show that this particular notice did not give all the conditions preceding to reinstatement of the contract. But let me, though, what I'm having some trouble with is, the whole question is, you know, is this sort of a manufactured standing? He says, I sent in the money, but I don't owe anything. So... He sent in the money because Ally was asking for money. They sent him a letter saying, you owe $9,694. But he said he didn't owe anything. Well, he didn't really say that, Your Honor. Okay. He thought it was unfair that they were asking for money, because the facts show that immediately after his car was repossessed, he had a, it was a brand-new Pontiac GTO that he had wanted since he was a kid. And immediately after the repossession, he made at least five telephone calls to try to get his car back. He called GM, he called Pontiac, and then when his post-repossession notice came, he called to try to get the amount due on the letter. But you see that... The amount... But he, I thought, I read him, his statements as saying, I really don't owe any money, but I did send $25, so... Well, he thought it was unfair that they were asking him for money, because he... So why did he send $25 if he didn't owe anything? He said... So he could have a lawsuit, right? No. The only evidence in the record as to why he sent the money was because Ally was asking for money. And another point on that is that Ally said, oh, well, this is statutorily required. We have to send this. They don't. They're citing the commercial code, Section 9616, but the applicable statute is not the commercial code. The applicable statute is 2983.2b. That requires an accounting statement only if a person liable in the contract asks for one in writing within a year after the sale, or if there's a surplus. Ally was not required to send this letter. Ally sent this letter because it wanted to be paid. And, in fact, their witness who testified about the collection said, oh, yes, that's the very first step that we make in collecting. First we send... So it's illegal to send the letter even if they want to be paid? No, it's not illegal. Okay, so there's nothing illegal. No, it's not illegal. There's nothing illegal about the letter. They're not required to send it, but they did. They did. And the reason they did is because they wanted to be paid. The illegality... Counsel. Sorry. Go ahead, Judge. I was going to ask a question to try to clarify something in my mind. Are you contending that the unfair competition is the defective notice of intent, or is the unfair competition the sending of the demand letter? The unfair competition is the sending of the demand letter demanding a deficiency that was not owed because Allies' post-repossession notice was materially defective. And under the statute 2983.2a, a deficiency is owed by the devolting consumer only if the finance company sends a notice that fully complies with the statute. The undisputed facts are that this notice did not come close to complying with the statute. Okay, Judge, this question was also my question, so now I want to make sure that I understand. So if they're not obligated to send the October letter, which we're calling the demand letter, the real problem here is the NOI letter, right? That's the one that has the deficiency. That's right. And that's the notice of intent is what triggers whether a deficiency is owed or not. Okay, and what's the error in the notice of intent? There are two. The primary is 2983.282, which requires the creditor to list all the conditions preceding to reinstatement. The undisputed facts are, at a minimum, that this notice of intent was missing a $75 redemption fee, a $23 inspection fee, and a $15 police release fee, so that if Mr. Wright had paid everything that's shown on the post-repossession notice of intent, even the day that he got it, he would not have gotten his car back. And Allies Witness testified that they would have required those additional fees to be paid. What's the causal link between that mistake and the damages that occurred to your client? He didn't pay anything. He didn't pay $25. He didn't pay, you know, the $24,000, $24,814.28 and then have Ally come back and say, surprise, there's another three fees we forgot to tell you about that you're also going to have to pay. That would clearly have been a causal link that would have given your client standing. But he ignores it all. So he doesn't pay them a penny. Well, that's the Juarez case, Your Honor. That's what happened in the Juarez case. They paid everything on the notice, and they still didn't get their car. And so then they brought a lawsuit. Right. But then you have, but then you've taken the NOI, you've paid what it took to pay, and then they withhold your car. Right. Here, he never did that. But he did pay money. He paid $25. Right. But we don't know. But back to Judge Gould and Judge Bybee's question, where's the beef, so to speak, in terms of the causation between they didn't include these three particular charges. They never imposed those on him. I mean, he never said, okay, here's all my money, please give me my car. And then they said, sorry, you owe, you know, 75 redemption, inspection, and police fee. He never got to that point. Nobody ever told him how much he had to pay. That was the problem. But they told him in the letter. Well, but that was wrong. Well, but we don't know that. We do know that. The testimony in the letter. He never paid the money and then said give me my car. Well, what you're saying is that in order to have standing, to challenge a materially defective notice, and then a post-repossession demand letter that says you have to pay all this deficiency. You have some causation between the defect and the damages. And the causation was that they sent him a demand letter saying he owed the deficiency, where, by law, under 2983.2a, the deficiency was not owed because the post-repossession notice did not include all the provisions that that statute says it has to include. And that was a balance that the California legislature. Maybe the answer is they can't collect that. They can't collect it. That is the answer. Okay, so then he has no damages other than if he pays up money, they have to give him his car. Well, the problem is. And he doesn't have any damage from this defective notice, right? He does. He does. It's been on his credit report as a deficiency charge-off for four years. It's still on his credit report. He can't get credit because. What's on his. Let me just understand. The deficiency on his credit report. That's right. You know, the various bars of derogatory bad person. That's right. That amount. Hang on. That amount is the amount they told him to pay in the NOI letter, right? That's right. Okay. No, no, I'm sorry. No, no, that isn't right. All right. The amount that is on his credit report right now is the amount that they tried to collect in the deficiency demand letter, the $9,600. Okay. Okay. And that doesn't, okay, does or does not include these three other charges? One doesn't have anything to do with the other, Your Honor. No. I'm asking you, it does or does not include the three other charges? That amount. The deficiency doesn't pay any attention to the charges that he would have had to pay in order to reinstate. I'm just trying to unpack everything. I mean, you're trying to get us to reach these conclusions. But we're trying to look at the causation. So just to be clear, the so-called black mark on his credit record is the $9,600 deficiency, which they said please pay up. He didn't pay up, so they gave him a bad credit. That's right. Okay. And then, okay, so that is a separate problem from the defective NOI, correct? The point is that there's a violation of the anti-deficiency provision of the Reslevering Act that says that unless a proper NOI is sent, no deficiency is owed. Here there was no proper NOI sent, so as a matter of law, no deficiency is owed. So the next question then becomes the credit report. And we have your experts. That's right. We don't have any, let me just understand, we don't have anything in the record that shows he tried to go out and get credit. Yes, there is. Okay. And where do we look to show that this credit, this negative credit statement impacted him? That's what I was looking for. He testified that he tried to buy a car later, and he was unable to buy a car because this deficiency was on his credit report, and he got turned down by six different car dealers. That evidence is in the record along with the evidence about, the evidence from Mr. Hendricks, the expert. Right. I was referring earlier to Hendricks, but now you've pointed me. What page or where is that in his testimony, Mr. Wright's testimony about his car purchase? Oh, let's see. Why don't we do this? You have two minutes left. I don't want to use. I don't want to use it either. I'll find it. Why don't you look it up during the break here or your colleague can, and then you can save your remaining time. Good morning, Your Honors. My name is Jan Chilton for the Appley Ally Finance. I think the Court's questions to opposing counsel have really focused the debate properly on the issues here regarding standing. There are essentially two ways that plaintiffs try to get, or a plaintiff tries to get standing here. One is his $25 payment, and the other is the credit report. Since the credit report came up last, let me start there because it's fresh in my mind. I remember the record very differently from counsel. What I remember at pages 70 and the next few in the ER is that Mr. Wright was asked at his deposition specifically whether he had applied for credit subsequent to the, well, it was GMAC at the time, the GMAC report to his credit agency, and that as yet, and he responded, no, I haven't as yet. Ask me tomorrow or next week. I might. I don't believe there's any evidence in the record that he actually applied for and was turned down for credit after the negative report, and certainly none that it was because of the negative report. And another thing about the record on... Looking around page 70-ish. 70-ish, yeah, and a little bit after. The 70 was the end of where he was explaining why he sent in the $25, and right after that point in the record he's asked about this business of did you apply for credit. Well, that did bring me to a question, though, in terms of, you know, there's an allegation, of course, that, and I think it's sort of common sense, if you have something bad in the credit record that can be negatively impacted, and that you have this testimony from Mr. Hendricks, the expert. Is that his name, Mr. Hendricks? Yes, ma'am. So he basically says, well, there's two reasons that there's a negative influence, and then he cites this FICO score, and then he says also when you make a credit application you have this charge-off, and that also is a big negative on your record. So the question I had is whether that is sufficient to create an issue of fact in this circumstance. I don't believe so, Your Honor, for two reasons. The first is that a negative credit report in itself is mere information. It is not a loss of money or property, which is what the California UCL requires. This is not Article III standing that we're talking about. It's a very different animal under the UCL, and the California Court of Appeals, pardon me, not Court of Appeals, Supreme Court, has been very clear that it requires more, and there's a narrower range of injury that is allowed under the UCL to create standing. It has to be an economic loss. Merely bad information is not an economic loss, and the two cases that we cited in our Appleese brief, which deal with disclosure of personal information in violation of law and so forth, really, I think, prove that point, that information is not money. Well, he says it's a deal killer, so is it sort of like an inchoate claim at that point? Because he gives some fairly compelling testimony about the problems with having a negative credit report. If you actually go out and apply for credit, which didn't happen here. In other words, you have to, for it to affect you, your property or your money, the information has to be used, and there's no evidence here that it ever was. Now, there's an additional reason, though, why Mr. Hendrick's report is not sufficient evidence, and that is that what he says is very general about what the effect of a charge-off on a credit report might be. Now about Mr. Hendrick's testimony? Yes. Whereas he never looked at Mr. Wright's credit report as a whole to see whether this particular charge-off was an added being sufficient to create real problems with this particular person's credit report. And that's important because we have in the record, it's not surprisingly in plaintiff's ER, but it is in the record. It's docket number 68-6, pages 70 to about 85, no, I'm sorry, 91. There is a full credit report at that point in the record, and it shows a total of eight charge-off accounts on Mr. Wright's credit other than the Ally one, and the charge-offs were in amounts of 11,000, 3,000, 1,000, and then smaller amounts. So, yes, in general it might be true that a ding is bad news, but at a certain point you get so many dings that it no longer matters. It's sort of like my 1985 Volvo station wagon, you know. I mean, one more ding doesn't affect its resale value. It's zero to begin with. That's sort of the problem here. His credit was so bad already, in other words, that another charge-off made no difference, and Mr. Hendricks doesn't analyze that question, doesn't say anything about it. He's just talking generally about, oh, a charge-off in general is a bad thing. Well, yeah. Counsel, I think I, as Judge Gould, I think I understand your argument on that point. I'd like to ask you to return to the other argument which you noted but haven't made. Thank you. On the notice of intent, let me frame this question that you could try to address as you go through it, in part. If we were to accept for sake of argument the argument advanced by right that the unfair competition being challenged was Allies' attempt to collect on an invalid deficiency and not the defective notice of intent itself, that is if unfair competition is the attempt to collect, then does he show a causal relationship between his damage and the deficiency by paying $25? Thank you, Your Honor. I appreciate your giving me a nice segue back into that issue, which is obviously a critical one, too. And clearly my answer is going to be no. Well, you didn't anticipate I would say otherwise, so let me explain why it's no. First off, there are two types of UCL violation that plaintiffs are pursuing. One is fraudulent. The other is unlawful. So let me hit fraudulent first. To ask a result of, go back. The statute says that, first standing, the plaintiff must show loss of money or property as a result of the unfair competition alleged. As a result of, the Supreme Court of California has said, in the context of a fraudulent business practice, means reliance. And we have in the Buckland v. Threshold Enterprises case, which I've cited in the Appleese brief, a further gloss on that word, reliance. Reliance occurs only when the prospective plaintiff acts in reliance on his belief in the truth of the allegedly false statement or misleading statement. Here it is clear, if anything is clear in the record, it's clear that Mr. Wright did not believe what GMAC told him in the notice of its calculation of the deficiency. And let me just back step. Well, let me finish that point before I get off point. He said, when asked, at page 214 of the ER, he was asked a question, what were your feelings at the time you received the deficiency letter? My feelings at that time is that's when I started really looking for a lawyer. I didn't feel like I owed GMAC. It couldn't be clearer that he didn't believe he owed the debt that was stated in the letter. And now let me go back to what the letter really was. The letter was not a demand for payment. The letter was a notice of how we calculated your surplus or deficiency. And it, you know, had an accounting on it. It's in the record many times, but at page 231 among others in the ER. The only thing it says that, apart from the sum that it arrives at, that could be taken as an effort at collection is the tagline at the very bottom, which says, for more information about this transaction or to make a payment or to make payment arrangements, you may call us at the number given above. So let me just try to connect up your argument with the argument made by Mr. Wright's counsel. She was saying that they view this letter as defective because it doesn't include these other smaller three charges. No, no, no, Your Honor. I'm sorry. I'm sorry first to interrupt you and secondly I'm sorry, but I think you're confusing two different letters. Okay. There's a notice of intent to dispose of the car that's sent prior to the sale. That is the letter that plaintiffs say did not contain the three extra charges. Yes, the NOI letter. Right. The NOI letter. The letter I'm talking about is the one in response to which Mr. Wright sent his $25. He paid the $25. And that letter was not a demand for payment. It was, as I said, a notice of how we calculated the deficiency. What's the date of that letter? It's, I believe, October 9th. It's October 7th. October, yeah. All right. I'm sorry. So they view that as, they characterize that as an unlawful demand letter. They do, and I think that's wrong. It's required, I also disagree with them about whether it's legally required. 2983.2B, let me back step. Both 2983.2B and UCC 9616B apply to this transaction. That's what the Supreme Court held in general in the LaLana case, is that a creditor in this situation must obey both the UCC and the Reese Levering Act. And 2983.2B says that the creditor must provide an accounting either automatically or upon written request. And here we provided it automatically. So it's a required letter, and contrary to counsel's argument, it is not the first step in collection. This, the notice of surplus or deficiency calculation, is sent by a different department before we start collecting. Now, let me go back and talk about unlawful quickly. The unlawful prong is that there was a, plaintiffs argue, so long as any unlawful thing occurs and we send a payment, bingo. That's enough. I think that reads, as a result of, out of the statute. The payment has to result from the illegality. And here, it certainly didn't result from any illegality in the NOI. The court's already gone through that. And there was no illegality in sending the notice of surplus or deficiency. It was legally required. And furthermore, Mr. Wright said in his deposition he didn't send it for either of those reasons. He sent it because he wanted to see what GMAC sent him next. That's at page, I don't have the page right with me. It's around 68 or 69 of the ER, 69 to 70. The, let me just say that we're dealing with a rather peculiar record here. If Mr. Wright had really made this payment because of something, because either he believed in the bill or because he was afraid of collection efforts or because he wanted to avoid another ding on his credit or because of any other act that he thought or that plaintiffs now contend was illegal, he could have told us so. He had many chances in his deposition to give a straight answer to why did you send the $25. He could have submitted a declaration. He didn't do any of those things. Instead, he gave equivocal responses when asked why did you send the $25. It was asked three times in the deposition. You can see for yourself his equivocal answers. They're pages 68 through 70. They're repeated later on in the transcript. But at no point did he say I did it because I believed I owed the money or I was afraid they were going to come and get my property or anything else that would link his payment positive or backwards, so it was the result of an illegal act by GMAC. Thank you. Thank you, Your Honor. Thank you. First, the evidence in the record as to his credit damage is on ER 136. His deposition was taken before he tried to buy a car, so he said I don't know how it affects my credit yet. Well, on 136 he said since GMAC sold my car, I've tried to purchase another car but have been unable to secure financing. I went to six different car dealers, blah, blah, blah, and a used car dealer. I was refused financing at all six because of the GMAC deficiency on my credit report. The deficiency took my credit score below 600, and no bank was willing to finance me because of that. That's on page 136. Secondly, Mr. Chilton argues that the commercial code section requires them to send a notice. Actually, Reese Levering specifically excludes that particular section. If you look at 2983.8, it says that certain sections of the commercial code are incorporated into Reese Levering. 9616 is not one of those sections, and the applicable statute, 2983.2b, does not require the creditor to send an accounting. Does that mean that sending an accounting is prohibited? No. It just means that the obvious purpose of sending this letter was to collect the deficiency. Well, that's not apparent. I'm looking at page 3 of the July 17th letter, and they've advised him that we will send you a written accounting of the sale of the vehicle. And if we don't do it, you may request it. But we said we're going to send you that. Okay, that's fine. They're not required to do that. That looks like that's exactly what they've done here. It's in the letter's title, how we calculated your surplus, and it's only calculated as of this day. And they've advised him that there may be other charges because interest will continue to approve. And it looks like this is exactly what they told him they were going to send him, an accounting. Well, yes, it does say that. And there's nothing that says they can't send that. But my point is that what he took that letter to be was a demand for money. Well, that may be. And that's why he paid the money. If it's not a demand letter, then I don't think you've got an argument because you're claiming that this is the letter that's deficient. We're claiming that the July 17 letter is deficient. I understand, but the way that you started your argument was by telling me that the October letter was the one that was deficient because he didn't owe the money because of the July letter, but that this is the one that he responds to, not the first one. So you had to begin with the causal connection between this letter and his $25 payment. The two go together, Your Honor. The deficiency is not owed unless the post-repossession notice complies with the statute. So a deficiency is owed if the creditor sends a post-repossession notice that complies with the statute. If they had never sent him a letter saying you owe $9,694, he never would have sent any money. There's no evidence that he would have sent any money had they not sent him a letter saying you owe $9,694. And that's our point. He had no obligation since he didn't know whether the sale of the GTO and whether he had taken such good care of the car that there was actually a surplus. Exactly. And so instead until they sent him the letter saying you owe $9,694, he didn't know if he owed anything to Ally. So that was the letter that triggered it. But the reason that it's not owed is the NOI that was back in July. If he had tried to make a payment back in July, tried to make full payment, and GMAC had sprung on him these additional charges, what would be the consequences under California law? And do you mean that they wouldn't have given his car back? Well, I'm wondering how California would have treated that. Would they have said that GMAC has collaterally stopped from collecting that, and therefore they must turn over the car to him? If he had paid the money in the ñ that listed in the notice and they didn't give him his car back, he would be in exactly the same position as the plaintiffs were in the Juarez case, the court of appeal case, where they paid all the money, they didn't get their car back. He ended up bringing a lawsuit on behalf of himself and all other people who were done for deficiencies they did not owe because the post-repossession notice did not comply with the statute. There isn't anything that they asked for in July that he didn't in fact owe. The problem is, is they didn't tell him of all of the charges they might owe. That's right, Your Honor. That's right. The problem is that the notice was incomplete, and according to the statute, they were required to give all of the conditions preceding to reinstatement. And his situation illustrates why that's important, because he did try ñ he realized that it's ñ if they had given him the additional notices, put the additional charges in there, would Mr. Wright have behaved differently? He wouldn't have a case, at least not on Base 2983.2a. Would he have played this out any differently between July and October? Well, he probably would have gotten his car back because if ñ Why would he have gotten his car back? He didn't make any payments at all on the initial letter. Why would the fact that they added ñ that they forgot to tell him about another hundred and ñ whatever it was, $113 on a ñ on a $24,000 car cause him to behave differently? Well, Your Honor, the record shows that he looked carefully at this notice, and it said, you will owe additional charges that aren't on this notice. There's language to that effect in there. He realized that that wasn't complete, and so that's why he tried to call them and he called them at least five times to try to find out, okay, if that's not the amount I have to pay, how much is it that I have to pay? If someone from Ally had called him back and said, this is the amount you have to pay, he probably would have gotten his car back and never brought this lawsuit. But because they never called him back and he never could get an answer. We're supposed to accept that he didn't make any payment towards the ñ in order to get his car back. And if they told him that there was another $100, $113 owed, that he would have made that payment? Well, Your Honor, he could have reinstated ñ that's the whole point. He could have reinstated the contract by paying about $2,000, not $24,000. Okay. And that was ñ that was the amount he ñ But he didn't make any attempt to do that. Again, if they had told him that there was another $113 and change on top of the 2,000, the $2,200, then he would have made the payment? Probably. If they had told him how much he had to pay. But they didn't. And that was the whole point. He realized that the language in the notice said, gosh, you know, this isn't complete. You're going to have to call us to figure out how much you have to pay. And to make matters even more confusing, Ally's offices at the time were in the Philippines. So it's not surprising that nobody ever called him back. Would you clarify something for me? I'm looking ñ the argument today really focuses on two things, payment of the $25 and then this ñ his credit situation, his credit history and what impact. And I'm reading ñ maybe I'm missing something. Am I rereading the district court's order on summary judgment, which seems to focus only on the $25 and not the credit report? It didn't address the credit at all. Okay. That's what I'm trying to understand. It was argued to the district court. Yes. And you had it in his declaration. Yes. And we had an expert declaration that was not ñ wasn't disputed in any way. That wasn't discussed in here either. So that's what I was just kind of perplexed by, why the district court order didn't address at all your credit issue. But it just didn't. It didn't. Okay. I'd also like to point out that the Aho case, that's a southern district case, did address this very issue. And that was ñ We're familiar with those. Okay. We've kind of exceeded your time here. All right. But we asked you a lot of questions. Okay. So thank you. The case just argued of Wright v. General Motors is submitted.
judges: McKeown, Gould, Bybee